ADAMS, J.

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, ) | |
| ) | CASE NO.   5:03CR387 |
| Plaintiff, ) | |
| ) | |
| v. ) | |
| ) | Judge John R. Adams |
| ERIC V. BARTOLI, ) | |
| ) | SENTENCING MEMORANDUM |
| Defendant. ) | AND ORDER |
| ) | |

**I.  Introduction**

On October 15, 2003, Defendant Eric Bartoli was charged in a ten count indictment related to defrauding investors that had placed funds in Cyprus Funds, Inc.  On July 13, 2016, Bartoli appeared before the Court and entered a guilty plea to eight of the ten counts in the indictment. On November 9, 2016, the Court sentenced Bartoli to 240 months incarceration. This memorandum will serve to supplement the Court's oral pronouncement of sentence.

**II. Sentencing Process**

Criminal sentencing is often described as a three-step process.  A district court must begin the process by calculating the advisory guideline range suggested by the United States Sentencing Commission.  *Rita v. United States*, 551 U.S. 338, 351 (2007) ("The sentencing judge… will normally begin by considering the presentence report and its interpretation of the Guidelines."). In so doing, the Court must determine the offense level for the crimes for which the defendant has been convicted and the defendant's criminal history. *See United States v. Boyd*, No. 3:07-CR-3, 2008 WL 4963198, at *14-16 (E.D.Tenn. Nov. 18, 2008).

Next, the Court must determine whether a variance or departure from the advisory guideline range would be appropriate.  *United States v. Collington*, 461 F.3d 805, 807 (6th Cir. 2006).

> Finally, a sentencing court must independently evaluate each of the factors in 18 U.S.C. § 3553(a), which details the considerations that a district court must weigh before sentencing a criminal defendant. Although the Guidelines form a starting point in the district court's analysis under 18 U.S.C. § 3553(a), a district court may not presume that the sentence suggested by the Guidelines is appropriate for an individual criminal defendant.  A district court may hear arguments by prosecution or defense that the Guidelines sentence should not apply.   In this way, a sentencing court subjects the defendant's sentence to the thorough adversarial testing contemplated by federal sentencing procedure. Ultimately, however, a court must exercise its independent judgment in sentencing a defendant.

*United States v. Stern*, 590 F.Supp.2d 945, 949 (N.D.Ohio 2008) (citations and quotations omitted).

### III.  Advisory Guideline Calculations

While the parties' plea agreement calculated the advisory guideline range to be 97 to 121 months, during the hearing the parties agreed that 87 to 108 months was the proper calculation.

### IV. Variance and § 3553(a) Factors

The Court must consider the factors set forth in 18 U.S.C. § 3553(a) in exercising its judgment to determine an appropriate sentence and must offer a reasoned explanation for the sentence.   In reaching the sentence herein, the Court considered the nature and circumstances of the offense and the history and characteristics of the defendant.    The Court also reviewed the need for the sentence imposed: a) to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense; b) to afford adequate deterrence to criminal conduct and to protect the public from further crimes of the Defendant; and c) to provide the

Defendant with needed educational or vocational training, medical care, and/or other correctional treatment in the most effective manner.

During the sentencing hearing, the Court detailed its analysis of each of the § 3553(a) factors. The Court intends this memorandum to supplement its oral findings.

At its simplest form, Bartoli's crime can be described as duping investors into giving him $64,600,000 with no real intent to ever invest that money. Roughly $30,600,000 was returned to these investors, leaving a nearly $34,000,000 loss. This loss figure resulted in the advisory guideline calculation set forth above. The loss figure itself, however, cannot begin to describe the intangible losses that resulted from Bartoli's conduct that are wholly unaccounted for in the advisory guideline calculation. Another court has described such losses as follows:

> The district court included another reason for the upward variance when it referred to the "life-destroying impacts" described by Christensen's victims. As noted by the district court, these victim-reported impacts included loss of homes, a failed marriage, postponement of retirement, foregone vacations, loss of life-savings, and loss of the ability to pay for children's private schooling. The victims reported the impacts they suffered from having lost all of their investment dollars, without differentiating losses that were solely attributable to Christensen's diversion of investor funds.
>
> These "life-destroying impacts" undoubtedly went beyond the stipulated losses to investors based on Christensen's diversion of funds. These "life-destroying impacts," however, were proper for the district court to consider even if not tied to the loss Christensen caused by misappropriating investor funds. There is "[n]o limitation ... on the information concerning the background, character, and conduct of a person convicted of an offense which a court ... may receive and consider for the purpose of imposing an appropriate sentence." 18 U.S.C. § 3661; *see also Pepper v. United States*, ––– U.S. ––––, 131 S.Ct. 1229, 1240, 179 L.Ed.2d 196 (2011) ("Permitting sentencing courts to consider the widest possible breadth of information about a defendant 'ensures that the punishment will suit not merely the offense but the individual defendant.' ") (quoting *Wasman v. United States*, 468 U.S. 559, 564, 104 S.Ct. 3217, 82 L.Ed.2d 424 (1984)). These "life-destroying impacts," supported by victim statements, provide greater insight into Christensen's "background, character, and conduct" that the district court was

> entitled to rely on in determining that for a specified loss resulting from criminal conduct, the Guidelines did not adequately account for the seriousness of Christensen's offense, provide adequate deterrence, or sufficiently protect the public and innocent investors from the infliction of further harm at the hands of Christensen. *See* 18 U.S.C. § 3553(a)(2). Moreover, it was not the dollar amount of these victims' losses that the district court relied on in imposing this upward variance; rather, it was the intangible nature of Christensen's conduct. As the district court stated:
>
> I believe that given the egregiousness of his conduct, including lying, covering up, using funds for personal purposes, destroying the victims' lives, cheating victims out of significant sums of money that they needed, and taking advantage of personal relationships, that the guideline range doesn't adequately account for the harm that his conduct has caused. There is a need—despite the fact that there has been almost 28 years between his last conviction, there still is a need I believe in this case to protect the public from further crimes.
>
> In addition, we note that many of the "life destroying impacts" were indivisible. For example, Jennifer R. attributed the dissolution of her 19–year marriage to Christensen's conduct.

*United States v. Christensen*, 732 F.3d 1094, 1104–05 (9th Cir. 2013).

Similar to the logic espoused by the district court in *Christensen* and approved by the Ninth Circuit, this Court found that Bartoli imposed life destroying impacts on many of his victims – losses that were not accounted for by a simple number in the loss amount column plugged into the advisory guidelines.

Given that Bartoli fled the country and was not captured until more than a decade later, these life destroying impacts can be seen clearly from many of the victim impact statements. Carmen G.'s husband and mother-in-law were both victims of Bartoli's scheme. Both passed away before Bartoli was sentenced. Carmen described the money that was invested as "their life savings, retirement money, and inheritance for children and grandchildren." Carmen went on to note that she can no longer help her children financially and must work part-time through her

4

retirement just to survive financially.  Denise S. described her father, another victim that passed away prior to Bartoli's sentence, as a frugal man that grew up during the Depression.  She described him "embarrassed and humiliated" at having been defrauded.  Tanya G. described Bartoli and his actions as follows: "He robbed our work, our savings, our efforts.  He took away our dreams and our plans for the future."

This latter statement was echoed time and again by the dozens of victims that provided statements to the Court.   Many of those victims were not focused on the precise amount of money they had lost.  Rather, they focused on all of the intangible items that were lost instead.  Grandparents were forced to return to work.  In so doing, they sacrificed time with their adult children and grandchildren.  Shopping trips were no longer enjoyable.  Instead, every penny had to be accounted for to ensure that there was no embarrassment when it came time to pay for simple necessities like groceries.

The loss of enjoyment of life could not be better exemplified by the letter received from Linda K, wife of victim David K.  At the time that David invested with Bartoli, he had recently retired and taken his retirement in the form of a lump sum.    Bartoli was all too happy to take the entirety of David's retirement funds.  At the time of David's retirement, the family had hoped their financial planning would allow Linda to retire just a few years after David.  Bartoli's fraud required Linda required Linda to work until January 8, 2016.  Tragically, David passed away 23 days later.  The advisory guidelines include a loss amount of just over $277,000 for David and Linda.  The guidelines, however, cannot begin to quantify the decade of retirement that Bartoli stripped away from the couple -- ten years that a couple could have spent visiting family, travelling the world, and perhaps more importantly, enjoying the company of one another.  Instead of those

ten years, Linda received 21 days with an ailing husband that ultimately passed away.

Yet another retirement-age victim, Angelo P., aptly summarized what many of the victims endured:  "What should have been a time of gentle reflection and peaceful enjoyment of a life well lived became a constant turmoil and stress of unbearable proportion. The enormity of the devastation is truly beyond words."

Victim after victim detailed to the Court the devastation that followed in the wake of Bartoli's fraud.  Many saw the health of a loved one fail due to the stress of the loss and the embarrassment of having been duped by Bartoli.  Many discussed at length the stress on their marriages and families.   Some noted that they lost the ability to trust in others at all.   To a person, every victim lost much more than the monetary loss accounted for by the advisory guidelines.

In the end, Bartoli's list of victims spanned nearly 700 names.   Those names often times did not include spouses, children, siblings, and grandchildren who were affected by the losses caused by Bartoli.   As a result, while not legally recognized as victims, there is little doubt from the record that Bartoli's fraud touched the lives of thousands of individuals, affecting numerous generations within families.

As the Court noted during its sentencing, the Court has never before seen such massive devastation caused by a financial scheme to defraud.  As a result, the Court concluded that a sentence of 240 months was sufficient but not greater than necessary in this matter.   In the end, with good time credit, Bartoli will serve less than ten days in prison for every victim whose life he ruined.  Ten days for stealing a decade of retirement from Linda K.  Ten days for stealing the hopes and dreams of Tanya G.    Ten days for stripping away the ability of Carmen G. to help her children financially.  With that backdrop, the Court cannot find that anything less than the

statutory maximum of 240 months is appropriate in this matter.

## V. Conclusion

Based upon the above reasoning, pursuant to the Sentencing Reform Act of 1984 and 18 U.S.C. § 3553, it is the judgment of the Court that the Defendant Eric Bartoli is hereby committed to the Bureau of Prisons for an aggregate term of 240 months. The Court stated the remaining terms of Bartoli's sentence on the record and in its journal entry of conviction. Accordingly, it declines to reiterate those terms herein.

IT IS SO ORDERED.

 December 20, 2016  /s/John R. Adams
Date JOHN R. ADAMS
UNITED STATES DISTRICT JUDGE